
AGR/DCG: USAO2010R00742

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| UNITED STATES OF AMERICA | * |
| | * |
| v. | *  CRIMINAL NO. PJM 14cr 362 |
| | * |
| SILVIU ZISCOVICI, M.D., | *  (Conspiracy to Possess with Intent to |
| a/k/a "Dr. Z," | *  Distribute and to Distribute and |
| | *  Dispense and to Cause the Distribution |
| Defendant | *  and Dispensation of Controlled |
| | *  Dangerous Substances, 21 U.S.C. § 846; |
| | *  Distribution and Dispensation and |
| | *  Causing and Attempting to Cause the |
| | *  Distribution and Dispensation of |
| | *  Controlled Dangerous Substances, |
| | *  21 U.S.C. § 841(a)(1); Money |
| | *  Laundering, 18 U.S.C. § 1957; Aiding |
| | *  and Abetting, 18 U.S.C. § 2; Forfeiture, |
| | *  21 U.S.C. § 853) |
| | * |

*******

### INDICTMENT

### COUNT ONE
(Conspiracy)

The Grand Jury for the District of Maryland charges that:

#### Introduction

At all times relevant to this Indictment:

1.  Defendant **SILVIU ZISCOVICI, M.D. ("ZISCOVICI"), a/k/a "Dr. Z,"** was a physician who held Maryland medical license number D47167 and Drug Enforcement Administration ("DEA") registration number BZ4692756.

2.  Originally trained as an internist (a physician specializing in internal medicine), defendant **ZISCOVICI** worked as a pain management specialist and practiced out of an office located at 11400 Rockville Pike, Suite 511, Rockville, Maryland 20852.

3.  Jay Blake Cox ("Cox") was a resident of Friendsville, Tennessee.

4.  The Controlled Substances Act governed the manufacture, distribution, and dispensing of controlled substances in the United States. Under the Controlled Substances Act, there were five schedules of controlled substances—Schedules I, II, III, IV, and V. Controlled substances were scheduled into these levels based upon their potential for abuse, among other things.

   a. Schedule I controlled substances, as defined in Title 21, United States Code, Section 812(b)(1), were drugs or other substances having a "high potential for abuse," and for which there is "no currently accepted medical use in treatment in the United States."

   b. Schedule II controlled substances, as defined in Title 21, United States Code, Section 812(b)(2), were drugs or other substances with "a high potential for abuse," "a currently accepted medical use in treatment in the United States or a currently accepted medical use with severe restrictions," and abuse of which "may lead to severe psychological or physical dependence."

   c. Schedule III controlled substances, as defined in Title 21, United States Code, Section 812(b)(3), were drugs or other substances with "a potential for abuse less than the drugs or other substances in [S]chedules I and II," "a currently accepted medical use in treatment in the United States," and abuse of which "may lead to moderate or low physical dependence or high psychological dependence."

   d. Schedule IV controlled substances, as defined in Title 21, United States Code, Section 812(b)(4), were drugs or other substances with "a low potential for abuse relative to the drugs or other substances in [S]chedule III," "a currently accepted medical use in treatment in the United States," and abuse of which "may lead to limited physical dependence or psychological

dependence relative to the drugs or other substances in [S]chedule III."

5. Oxycodone was an opioid pain medication and a Schedule II controlled substance, which was available in generic form and under brand names including OxyContin, Percocet, Roxicodone, Roxicet, and Endocet. Oxycodone was available in short-acting and extended-release formulations.

6. Methadone was an opioid pain medication and a Schedule II controlled substance, which was commonly used as a pain reliever or as part of a drug addiction detoxification and maintenance program.

7. Opana was a semi-synthetic opioid pain medication containing oxymorphone, a Schedule II controlled substance, which was available in short-acting and extended release formulations.

8. MS Contin was an opioid pain medication containing morphine, a Schedule II controlled substance, which was available in an extended release formulation.

9. Hydromorphone was an opioid pain medication and a Schedule II controlled substance, which was available in short-acting and extended release formulations, and under the brand name Dilaudid.

10. Alprazolam was a depressant and a Schedule IV controlled substance, which was part of the benzodiazepine class of drugs. Alprazolam was commonly used for the treatment of anxiety, and was available in generic form and under the brand name Xanax.

11. Title 21, United States Code, Section 841(a)(1), provided that "[e]xcept as authorized by this subchapter, it shall be unlawful for any person to knowingly or intentionally . . . manufacture, distribute, or dispense, or possess with intent to manufacture, distribute, or dispense, a controlled substance."

3

12. Title 21, United States Code, Section 802(10), provided that the term "dispense" meant to deliver a controlled substance to an ultimate user or research subject by, or pursuant to the lawful order of, a practitioner, including the prescribing and administering of a controlled substance and the packaging, labeling, or compounding necessary to prepare the substance for delivery.

13. Title 21, United States Code, Section 821, provided that "[t]he Attorney General [of the United States] is authorized to promulgate rules and regulations relating to the registration and control of the manufacture, distribution and dispensing of controlled substances."

14. The Attorney General of the United States exercised his rulemaking authority regarding the dispensing of controlled substances through the promulgation of Title 21, Code of Federal Regulations, Section 1306.04, governing the issuance of prescriptions. This provision provided, among other things, that in order for a prescription for a controlled substance to be effective, it must be issued for a legitimate medical purpose by an individual practitioner acting in the usual course of his professional practice. Moreover, an order purporting to be a prescription issued not in the usual course of professional treatment was not a prescription within the meaning and intent of Section 309 of the Controlled Substances Act [21 U.S.C. § 829], and the person knowingly issuing said order was subject to the penalties provided for violations of the law relating to controlled substances.

15. Accordingly, as a medical doctor, defendant **ZISCOVICI** was authorized to dispense to patients Schedule II controlled substances and to prescribe medicine, including controlled substances, to patients, only for legitimate medical purposes and in the usual course of professional practice.

16. In actuality, defendant **ZISCOVICI** repeatedly failed to individually assess the

4

medical needs of persons who visited his offices. As a result, defendant **ZISCOVICI**'s office served as a "pill mill," at which so-called "patients" for a fee obtained prescriptions for controlled substances without any demonstrated medical necessity for controlled substances.

### The Conspiracy

17. Between in at least July 2009, and continuing through on or about June 22, 2010, in the District of Maryland and elsewhere, the defendant,

**SILVIU ZISCOVICI, M.D.,**
a/k/a "Dr. Z,"

did combine, conspire, confederate, and agree with Jay Blake Cox, and with others known and unknown, to possess with the intent to distribute, and to distribute and dispense, and to cause to be distributed and dispensed, a quantity of a mixture and substance containing a detectable amount of oxycodone, a Schedule II controlled substance; a quantity of a mixture and substance containing a detectable amount of methadone, a Schedule II controlled substance; a quantity of a mixture and substance containing a detectable amount of morphine, a Schedule II controlled substance; and a quantity of a mixture and substance containing a detectable amount of alprazolam, a Schedule IV controlled substance, in violation of Title 21, United States Code, Section 841(a)(1).

### Manner and Means of the Conspiracy

18. It was part of the conspiracy that Cox repeatedly provided transportation for himself and others from Tennessee to defendant **ZISCOVICI**'s office in Rockville, Maryland, for the purpose of obtaining prescriptions for Schedule II and Schedule IV controlled substances from defendant **ZISCOVICI**.

19. It was further part of the conspiracy that Cox partially financed the expenses of the trip for some of the individuals accompanying him, and, in return, these individuals would give

him a portion of the Schedule II controlled substances that had been prescribed by defendant **ZISCOVICI**.

20. It was further part of the conspiracy that, upon his return to Tennessee, Cox distributed these Schedule II controlled substances.

21. It was further part of the conspiracy that defendant **ZISCOVICI** instructed Cox not to bring anyone under the age of 25 or anyone with visible "track marks" (scarring of veins resulting from the use of blunt injecting equipment, such as disposable syringes) to **ZISCOVICI**'s office.

22. It was further part of the conspiracy that, upon being informed by Cox that Cox and some of the individuals Cox was transporting from Tennessee were having difficulty filling prescriptions for controlled substances that defendant **ZISCOVICI** had written, defendant **ZISCOVICI** instructed Cox to identify a pharmacy willing to fill the prescriptions and to provide that pharmacy with advance notice as to the types and quantities of controlled substances being prescribed, so that the pharmacy would have a sufficient supply available.

23. It was further part of the conspiracy that defendant **ZISCOVICI** distributed and dispensed, and caused to be distributed and dispensed, oxycodone, methadone, morphine, and alprazolam that was not prescribed for a legitimate medical purpose and not in the usual course of professional practice in one or more of the following non-exhaustive manners:

    a. inadequately verifying the patients' medical complaints;

    b. conducting cursory, incomplete, inadequate or no medical examination;

    c. collecting and reviewing inadequate patient medical histories and follow-up verifications;

    d. conducting insufficient dialogue with patients regarding treatment options

and risks and benefits of such treatments;

  e. primarily treating patients with highly addictive controlled substances while failing to consider other treatment options;

  f. failing to refer patients to specialists for treatment;

  g. prescribing controlled substances despite inadequate diagnostic testing;

  h. increasing patients' dosages over time or switching to more powerful controlled substances with no medical justification;

  i. prescribing inappropriate combinations of medications and failing to counsel patients as to the proper usage and the risks associated with the prescribed cocktail of medications;

  j. treating a large number of patients who either resided outside of the state or had travelled long distances to Maryland in order to obtain prescriptions for highly addictive controlled substances;

  k. prescribing highly addictive controlled substances to patients who complained of undocumented or uncorroborated physical ailments, such as back and neck pain, where lesser treatment options would be indicated;

  l. failing to assess the risk of abuse for individual patients;

  m. failing to monitor patients' responses to the medication or compliance with medical usage; and

  n. continuing to prescribe controlled substances even after the results of patients' toxicology screens showed non-use of the prescribed controlled substances or use of non-prescribed controlled substances.

21 U.S.C. § 846

## COUNTS TWO THROUGH TWENTY-SEVEN
(Distribution of Controlled Dangerous Substances)

The Grand Jury of the District of Maryland further charges that:

1. Paragraphs 1, 2, 4 through 16, and 23 of Count One are incorporated here.

2. On or about each of the dates listed below, in the District of Maryland and elsewhere, the defendant,

**SILVIU ZISCOVICI, M.D.,**
a/k/a "Dr. Z,"

knowingly and intentionally distributed and dispensed, and caused to be distributed and dispensed, and attempted to cause to be distributed and dispensed, a quantity of a mixture and substance containing a detectable amount of oxycodone, a Schedule II controlled substance; a quantity of a mixture and substance containing a detectable amount of methadone, a Schedule II controlled substance; a quantity of a mixture and substance containing a detectable amount of morphine, a Schedule II controlled substance; a quantity of a mixture and substance containing a detectable amount of oxymorphone, a Schedule II controlled substance; a quantity of a mixture and substance containing hydromorphone, a Schedule II controlled substance; and a quantity of a mixture and substance containing a detectable amount of alprazolam, a Schedule IV controlled substance, outside the usual course of professional practice and without a legitimate medical purpose.

| COUNT | RECIPIENT | DATE | SUBSTANCES |
|---|---|---|---|
| 2 | D.K. | July 28, 2009 | Oxymorphone Hydromorphone Alprazolam |
| 3 | Jay Blake Cox | July 31, 2009 | Morphine Oxycodone |
| 4 | D.K. | August 1, 2009 | Oxymorphone |
| 5 | D.K. | August 24, 2009 | Oxymorphone |

| 6 | Jay Blake Cox | August 27, 2009 | Morphine<br>Oxycodone |
|---|---|---|---|
| 7 | "M.P." | August 27, 2009 | Oxycodone<br>Alprazolam |
| 8 | D.K. | September 15, 2009 | Oxymorphone<br>Oxycodone<br>Alprazolam |
| 9 | "T.G.P." | September 21, 2009 | Oxycodone<br>Alprazolam |
| 10 | T.C. | September 26, 2009 | Methadone<br>Oxycodone<br>Alprazolam |
| 11 | D.K. | October 13, 2009 | Oxymorphone<br>Oxycodone<br>Alprazolam |
| 12 | T.C. | October 17, 2009 | Methadone<br>Oxycodone<br>Alprazolam |
| 13 | "T.G.P." | October 19, 2009 | Oxycodone<br>Alprazolam |
| 14 | Jay Blake Cox | October 21, 2009 | Methadone<br>Morphine<br>Oxycodone |
| 15 | "M.P." | November 4, 2009 | Oxycodone<br>Alprazolam |
| 16 | D.K. | November 10, 2009 | Oxycodone<br>Oxymorphone |
| 17 | T.C. | November 16, 2009 | Methadone<br>Oxycodone<br>Alprazolam |
| 18 | Jay Blake Cox | November 18, 2009 | Methadone<br>Morphine<br>Oxycodone |
| 19 | D.K. | December 15, 2009 | Oxycodone<br>Oxymorphone |
| 20 | Jay Blake Cox | December 15, 2009 | Methadone<br>Morphine<br>Oxycodone<br>Alprazolam |
| 21 | T.C. | December 21, 2009 | Methadone<br>Oxycodone<br>Alprazolam |
| 22 | D.K. | January 5, 2010 | Oxycodone<br>Oxymorphone |

| 23 | Jay Blake Cox | January 13, 2010 | Methadone<br>Morphine<br>Oxycodone |
|---|---|---|---|
| 24 | T.C. | January 22, 2010 | Methadone<br>Oxycodone<br>Alprazolam |
| 25 | K.H. | February 2, 2010 | Oxycodone<br>Alprazolam |
| 26 | D.K. | February 2, 2010 | Oxycodone<br>Oxymorphone |
| 27 | Jay Blake Cox | February 12, 2010 | Methadone<br>Morphine<br>Oxycodone<br>Alprazolam |

21 U.S.C. § 841(a)(1)
18 U.S.C. § 2

## COUNT TWENTY-EIGHT
### (Distribution of Controlled Dangerous Substance with Death Resulting)

The Grand Jury of the District of Maryland further charges that:

1. Paragraphs 1, 2, 4, 6, 11 through 16, and 23 of Count One are incorporated here.

2. On or about February 2, 2010, in the District of Maryland, the defendant,

**SILVIU ZISCOVICI, M.D.,**
a/k/a Dr. Z,

did knowingly, intentionally and unlawfully distribute and dispense, and caused to be distributed and dispensed, a quantity of a mixture and substance containing a detectable amount of methadone, a Schedule II controlled substance, outside the usual course of professional practice and without a legitimate medical purpose, and death resulted from the use of such substance.

21 U.S.C. § 841(a)(1)
21 U.S.C. § 841(b)(1)(C)
18 U.S.C. § 2

11

## COUNT TWENTY-NINE
(Money Laundering)

The Grand Jury for the District of Maryland further charges that:

1. Paragraphs 1 through 16 and 18 through 23 of Count One are incorporated here.

2. The conspiracy to possess with the intent to distribute, and to distribute and dispense, and to cause to be distributed and dispensed, controlled substances, as well as the distribution and dispensation, and causing the distribution and dispensation of, controlled substances, generated large amounts of cash currency. Defendant ZISCOVICI used the proceeds to purchase, among other items, a vehicle.

3. On or about August 15, 2009, in the District of Maryland, the defendant,

**SILVIU ZISCOVICI, M.D.,**
a/k/a "Dr. Z,"

aided and abetted by persons known and unknown to the Grand Jury, did knowingly and willfully engage in a monetary transaction affecting interstate commerce, in criminally derived property of a value greater than $10,000, that is, the purchase of a 2005 Volkswagen Jetta, Vehicle Identification Number 3VWPF71K85M619761, from Congressional Motors, Inc. located at 801 Rockville Pike, MD 20852, with a check from his SunTrust Bank business checking account ending in 6856 in the amount of $13,983.70, such property having been derived from specified unlawful activities, that is, conspiracy to possess with the intent to distribute, and to distribute and dispense, and to cause to be distributed and dispensed, controlled substances, outside the usual course of professional practice and without a legitimate medical purpose, in violation of Title 21, United States Code, Section 846, as alleged in Count One of this Indictment, and distributing and dispensing controlled substances, and causing the distribution and dispensation of controlled substances, and attempting to cause the distribution and dispensation of controlled substances, in

12

violation of Title 21, United States Code, Section 841, as alleged in Counts Two, Three, and Four of this Indictment.

18 U.S.C. § 1957
18 U.S.C. § 2

## FORFEITURE ALLEGATION

The Grand Jury for the District of Maryland further finds that:

1.     Pursuant to Fed. R. Crim. Proc. 32.2, notice is hereby given to the defendant that the United States will seek forfeiture as part of any sentence in accordance with Title 21, United States Code, Section 853, Title 18, United States Code, Section 982(a)(1), and Title 28, United States Code, Section 2461(c), as a result of the defendant's convictions under the Counts of this Indictment.

### Narcotics Forfeiture

2.     Pursuant to Title 21, United States Code, Section 853(a), upon conviction of an offense in violation of the Controlled Substances Act, as alleged in Counts One through Twenty-Eight of the Indictment, the defendant,

**SILVIU ZISCOVICI, M.D.,**
a/k/a "Dr. Z,"

shall forfeit to the United States of America:

   a.     any property constituting, or derived from, any proceeds obtained, directly or indirectly, as the result of such violation; and

   b.     any property used or intended to be used, in any manner or part, to commit, or to facilitate the commission of, such violation.

3.     The property to be forfeited includes, but is not limited to, the following:

   a.     At least $651,500.00, in that such sum in aggregate constitutes proceeds traceable to the dispensation of controlled substances, in violation of the Controlled Substances Act;

   b.  $392,311.00 in cash deposited into Sun Trust Bank business checking account ending in 6856 between July 28, 2009, and June 22, 2010;

   c.  $6,282.00 in cash seized from 5922 Empire Way, Rockville, MD 20852, on March 2, 2010;

   d.  $140,616.00 in cash seized from safe deposit box ending in 037 at the SunTrust Bank branch located at 1701 Rockville Pike, Rockville MD 20852, on March 5, 2010;

   e.  $5,350.00 in cash seized from safe deposit box ending in 128 at the SunTrust Bank branch located at 1701 Rockville Pike, Rockville MD 20852, on March 5, 2010;

   f.  $6,338.50 in assorted coins seized from safe deposit box ending in 037 at the Sun Trust Bank branch located at 1701 Rockville Pike, Rockville MD 20852, on March 5, 2010;

   g.  $54,168.00 in assorted coins and jewelry seized from safe deposit box ending in 133 at SunTrust Bank branch located at 1701 Rockville Pike, Rockville MD 20852, on March 5, 2010;

   h.  $5,993.40 in assorted coins and jewelry seized from safe deposit box ending in 128 at the Sun Trust Bank branch located at 1701 Rockville Pike, Rockville MD 20852 on March 5, 2010; and

   i.  a 2005 Volkswagen Jetta, Vehicle Identification Number 3VWPF71K85M619761.

### Money Laundering Forfeiture

  4.  Pursuant to Title 18, United States Code, Section 982(a)(1), and as a result of the offense set forth in Count Twenty-Nine of this Indictment, the defendant,

SILVIU ZISCOVICI, M.D.,
a/k/a "Dr. Z,"

shall forfeit to the United States of America all property, real or personal, involved in such offense, and all property traceable to such property. The property to be forfeited includes, but is not limited to, a 2005 Volkswagen Jetta, Vehicle Identification Number 3VWPF71K85M619761.

**Substitute Assets**

5. If, as a result of any act or omission of the defendant, any such property subject to forfeiture:

    a. cannot be located upon the exercise of due diligence;

    b. has been transferred or sold to, or deposited with, a third person;

    c. has been placed beyond the jurisdiction of the Court;

    d. has been substantially diminished in value; or

    e. has been commingled with other property which cannot be subdivided without difficulty;

the United States of America shall be entitled to forfeiture of substitute property pursuant to Title 21, United States Code, Section 853(p).

21 U.S.C. § 853
18 U.S.C. § 982
28 U.S.C. § 2461(c)

*Rod J. Rosenstein*
Rod J. Rosenstein
United States Attorney

A TRUE BILL:

**SIGNATURE REDACTED**

Foreperson

Dated: July 28, 2014